**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 20-1031

THE COUNTY BOARD OF ARLINGTON COUNTY, VIRGINIA,

Plaintiff - Appellee,

v.

EXPRESS SCRIPTS PHARMACY, INC.; ESI MAIL PHARMACY SERVICE, INC.,

Defendants - Appellants,

and

MALLINCKRODT PLC; MALLINCKRODT LLC; SPECGX LLC; ENDO HEALTH SOLUTIONS INC.; ENDO PHARMACEUTICALS INC.; PAR PHARMACEUTICAL COMPANIES, INC.; PAR PHARMACEUTICAL, INC.; TEVA PHARMACEUTICALS USA, INC.; CEPHALON, INC.; BARR LABORATORIES, INC.; WATSON LABORATORIES, INC.; ACTAVIS PHARMA, INC.; ACTAVIS, LLC; ALLERGAN PLC; ALLERGAN FINANCE, LLC; MYLAN PHARMACEUTICALS, INC.; MYLAN INSTITUTIONAL INC.; INDIVIOR INC.; MCKESSON CORPORATION; MCKESSON MEDICAL-SURGICAL INC.; CARDINAL HEALTH, INC.; AMERISOURCEBERGEN DRUG CORPORATION; GENERAL INJECTABLES & VACCINES, INC.; INSOURCE, INC.; CVS HEALTH CORPORATION; CVS PHARMACY, INC.; CVS TN DISTRIBUTION, L.L.C.; WALGREENS BOOTS ALLIANCE, INC.; WALGREEN CO.; WALGREEN EASTERN CO., INC.; EXPRESS SCRIPTS HOLDING COMPANY; EXPRESS SCRIPTS, INC.; CAREMARK RX, L.L.C.; CAREMARKPCS HEALTH, L.L.C.; CAREMARK, L.L.C.; CAREMARKPCS, L.L.C.; UNITEDHEALTH GROUP INCORPORATED; OPTUM, INC.; OPTUMRX, INC.; WALMART, INC.; RITE AID CORP.; RITE AID OF VIRGINIA, INC.; RITE AID MID-ATLANTIC; RITE AID OF MARYLAND, INC.; ECKERD CORPORATION; DOES 1 -100; HENRY SCHEIN, INC.,

Defendants.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Anthony J. Trenga, District Judge. (1:19-cv-01446-AJT-JFA)

Argued: March 9, 2021                                                Decided: May 3, 2021

Before WILKINSON, NIEMEYER, and QUATTLEBAUM, Circuit Judges.

Reversed and remanded by published opinion. Judge Quattlebaum wrote the opinion, in which Judge Wilkinson and Judge Niemeyer joined.

**ARGUED:** Adriana Riviere-Badell, KOBRE & KIM LLP, Miami, Florida, for Appellants. R. Johan Conrod, Jr., SANFORD HEISLER SHARP, LLP, Nashville, Tennessee, for Appellee. **ON BRIEF:** Matthew I. Menchel, Miami, Florida, Julian W. Park, KOBRE & KIM LLP, San Francisco, California, for Appellants. Grant Morris, Kevin Sharp, Andrew Miller, SANFORD HEISLER SHARP, LLP, Nashville, Tennessee; Joanne Cicala, THE CICALA LAW FIRM PLLC, Dripping Springs, Texas; W. Edgar Spivey, KAUFMAN & CANOLES, P.C., Norfolk, Virginia, for Appellee.

QUATTLEBAUM, Circuit Judge:

This appeal involves the application of 28 U.S.C. § 1442(a)(1)—commonly referred to as the "federal officer removal statute"—to private actors. Under the statute, private actors can remove a case to federal court when they show that they: (1) acted under the direction of a federal officer; (2) possess a colorable federal defense; and (3) engaged in government-directed conduct that was causally related to the plaintiff's claims. *See Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 254 (4th Cir. 2017).[1]

Here, the County Board of Arlington County, Virginia ("Arlington") sued a host of opioid manufacturers, distributers and pharmacies, including Express Scripts Pharmacy, Inc. and ESI Mail Pharmacy Service, Inc. (collectively the "ESI Defendants"), in state court for causing, or contributing to, the opioid epidemic in Arlington County, Virginia. The ESI Defendants removed the case to federal court pursuant to the federal officer removal statute. They claimed their operation of the TRICARE Mail Order Pharmacy ("TMOP")

---

[1] "The federal officer removal statute has had a long history." *Willingham v. Morgan*, 395 U.S. 402, 405 (1969). The original removal statute was enacted "near the end of the War of 1812," which was unpopular in New England due to a trade embargo with England. *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 147 (2007). As a result, New England shipowners "filed many state-court claims against federal customs officials charged with enforcing [the embargo]." *Id.* Congress responded by passing a statute "that permitted federal customs officers and '*any other person aiding or assisting*' those officers to remove a case filed against them 'in any state court' to federal court." *Id.* at 148 (quoting Customs Act of 1815, ch. 31, § 8, 3 Stat. 198 (emphasis added)). Since that time, Congress has passed various iterations of the federal officer removal statute. The "basic purpose" of these enactments was to prevent state courts from interfering with the federal government's operations. *See id.* at 150 (internal quotation marks omitted). For example, "[s]tate-court proceedings may reflect 'local prejudice' against unpopular federal laws or federal officials." *Id.* (quoting *Maryland v. Soper (No. 1)*, 270 U.S. 9, 32 (1926)). Therefore, the statute provides "a federal forum for a federal defense." *Ripley v. Foster Wheeler LLC*, 841 F.3d 207, 210 (4th Cir. 2016).

3

as a subcontractor to a contract between their corporate affiliate, Express Scripts, Inc.,[2] and the Department of Defense ("DOD") satisfied each of the statute's requirements. Arlington moved to remand the case to state court, contending that the ESI Defendants cannot satisfy the requirements of the federal officer removal statute. The district court granted the motion, emphasizing that the ESI Defendants operated the TMOP as subcontractors of Express Scripts, Inc. and that their interactions with DOD were "too attenuated, infrequent, and peripheral to satisfy the 'acting under' requirement." J.A. 823.

We disagree. The ESI Defendants met their burden of showing that they were "acting under" DOD in operating the TMOP in accordance with the DOD contract. Furthermore, while the district court did not address the other two requirements of the federal officer removal statute—possession of a colorable federal defense and a causal relationship between the government-directed conduct and the plaintiffs' claims—we find that judicial economy favors resolution of those questions without a time-consuming and costly remand. On the merits, we hold that the ESI Defendants satisfy those two requirements. Accordingly, we reverse the district court's ruling, hold that removal was proper and remand for further proceedings.

---

[2] Express Scripts, Inc. is a distinct entity from the ESI Defendants. Express Scripts, Inc. is the contracting party with DOD, while the ESI Defendants are subcontractors who administer the TMOP pursuant to the requirements of the contract.

I.

Arlington sued a large number of manufacturers, distributors and pharmacies that dispense opioid medications in state court seeking to recover financial costs incurred as a result of widespread opioid use. This case is not unusual, as over 2,000 cases filed by governmental entities have been consolidated into a federal multidistrict litigation case in the Northern District of Ohio (the "Opiate MDL"). *See In re Nat'l Prescription Opiate Litig.*, 290 F. Supp. 3d 1375, 1378 (J.P.M.L. 2017).

Later, Arlington amended its Complaint, adding the ESI Defendants. Arlington alleges that the defendants, including the ESI Defendants, "have caused an opioid epidemic that has resulted in economic, social and emotional damage to virtually every community in the United States and tens of thousands of Americans." J.A. 53. According to Arlington, "Arlington County has been hit hard by the opioid epidemic," with increasing rates of neonatal abstinence syndrome and Hepatitis C since 2011. J.A. 55. Moreover, the rate of overdose deaths in Arlington County has approximately tripled during the period of 1999 to 2016.

Arlington has asserted claims against three groups of defendants: (1) opioid manufacturers; (2) opioid distributors; and (3) pharmacies that fill opioid prescriptions. The ESI Defendants fall into the third category, as they operate mail order pharmacies that distribute opioid medications to patients both nationally and in Arlington County. To that end, Arlington seeks to impose liability on the ESI Defendants because they were "keenly aware of the oversupply of prescription opioids through the extensive data and information

5

they developed and maintained" but failed to "tak[e] any meaningful action to stem the flow of opioids into the communities . . . ."[3] J.A. 152.

The ESI Defendants removed the case under the federal officer removal statute.[4] In support of removal, the ESI Defendants claimed that "Express Scripts holds a contract with [DOD] to provide services to members of the DOD health care program, TRICARE, across the country, including in Arlington County, Virginia." J.A. 22. TRICARE is a federal health insurance program administered by DOD to "provide[] medical care to current and retired service members and their families . . . ." *United States ex rel. Lutz v. United States*, 853 F.3d 131, 140 n.2 (4th Cir. 2017) (citing 32 C.F.R. § 199.17). TRICARE is extensively governed by various federal statutes and regulations. *See, e.g.*, 10 U.S.C. § 1071 (providing for "an improved and uniform program of medical and dental care for members and certain former members of [the armed] services, and for their dependents"); 32 C.F.R. § 199.17 (establishing regulations for operating TRICARE). The ESI Defendants operate the TMOP as subcontractors for their corporate affiliate, Express Scripts, Inc. Therefore, "Express Scripts, Inc. provides pharmacy benefit management services and [the ESI Defendants]

---

[3] Arlington alleged eight causes of action against the ESI Defendants—statutory public nuisance, common law public nuisance, common law civil conspiracy, negligence *per se*, negligence, gross negligence, willful and wanton negligence and unjust enrichment—and seeks compensatory damages of at least $150,000,000 and punitive damages of $350,000 per defendant.

[4] This was not the first Notice of Removal filed in this case. After Arlington filed its initial Complaint, Defendants Actavis LLC, Express Scripts Holding Company and Express Scripts, Inc. removed the case on diversity of citizenship grounds. But, the district court determined that diversity of citizenship did not exist and remanded the case to state court.

administer the TRICARE Mail Order Pharmacy under the detailed requirements of the contract . . . ." J.A. 22–23. Furthermore, the ESI Defendants contended that Arlington's allegations that they "maintained formularies and dispensed opioids cannot be separated from [their] services provided under the DOD contract." J.A. 24. Finally, the ESI Defendants asserted that they could assert two colorable federal defenses—the government contractor defense and federal preemption.

Arlington promptly moved to remand the case to state court, claiming that the ESI Defendants' reliance on the federal officer removal statute was improper because they were not parties to the DOD contract and were not registered to contract with the federal government. Therefore, according to Arlington, the ESI Defendants were not "acting under" the direction of a federal officer—i.e., DOD. Furthermore, Arlington argued that there was no causal nexus between its claims against the ESI Defendants and their administration of the TMOP. Emphasizing that point, Arlington claimed that it "has not made any allegations about injuries to veterans." J.A. 250. Finally, Arlington argued that, because "there is no direct contractual relationship or detailed control by a federal officer, the government contractor defense is unavailable" and federal preemption does not apply. J.A. 251–52.[5]

---

[5] Although not critical to our decision, the Opioid MDL adds some wrinkles to the removal issues presented here. The ESI Defendants filed a Motion for a Temporary Stay Pending the Judicial Panel on Multidistrict Litigation's ("JPML") Final Transfer Decision. Upon removal, the ESI Defendants tagged this case for potential inclusion in the Opiate MDL. The JPML entered a conditional transfer order ("CTO"), and a hearing was scheduled. The CTO did not prevent the district court from ruling on the pending Motion to Remand. By making this request, the ESI Defendants asked the district court to defer

7

The district court granted the motion to remand. It noted that neither of the ESI Defendants is "an actual party to the [DOD] contract and neither is registered to contract with the federal government." J.A. 818. Nonetheless, the district court rejected Arlington's argument that the absence of a contractual relationship is a bar to federal officer removal. Instead, the district court looked to "whether there otherwise exists a sufficiently close, direct relationship between the non-government entity and a federal officer or agency." J.A. 818. In that analysis, the district court acknowledged that the ESI Defendants administered TMOP, were required to use DOD's formulary, served as a fiscal intermediary for DOD's purchase of drugs, could not modify the contract without express authorization from DOD and, without the ESI Defendants' services, DOD "would have to administer the mail order pharmacy program itself." J.A. 820–21. Ultimately, however, the district court emphasized that "there has never been any *direct* interaction between DOD's

deciding any jurisdictional issues so that "the Opiate MDL Court [can] decide the jurisdictional issues collectively with other opioid cases raising similar issues." *See* J.A. 274 (noting that "at least 25 other opioid cases [] have been removed since 2018 under the federal officer statute," many of which have been transferred, or are awaiting transfer, to the Opiate MDL). Additionally, the ESI Defendants filed a Conditional Motion for an Order Implementing an Automatic Stay Under Federal Rule of Civil Procedure 62(a), seeking a "30-day stay of any execution of any remand order under Federal Rule of Civil Procedure 62(a) so that [the ESI Defendants] may seek appellate review under 28 U.S.C. § 1447(d)." J.A. 463. The district court first gave special consideration to the Motion to Remand in light of the related Opiate MDL proceedings to determine whether the Opiate MDL court would be better suited to rule on the jurisdictional issue. To that end, the district court made a preliminary determination that "removal was improper" and "there are no legal or factual issues sufficiently difficult to counsel against a final ruling on the merits of th[e] jurisdictional issue." J.A. 815. Therefore, the district court determined that a stay— and an almost-certain final transfer order from the JPML—"would needlessly burden the Opiate MDL court with an action over which it has no jurisdiction . . . ." J.A. 815.

8

representative and the [ESI Defendants]." J.A. 823. Instead, the district court concluded, "[a]t most, there is limited, direct interaction between the DOD and the [ESI Defendants] in connection with audits performed under the [Statement of Work], but it appears that this interaction is too attenuated, infrequent, and peripheral to satisfy the 'acting under' requirement." J.A. 823 (internal citation omitted). Therefore, the district court held that the ESI Defendants "do not have a sufficiently direct relationship with a federal officer or agency to support federal officer jurisdiction."[6] J.A. 824. In light of this holding, the district court declined to address whether there was a nexus between the ESI Defendants' actions, taken under a federal officer's directions, and Arlington's claims or a colorable federal defense to Arlington's claims. But, after remanding the case, the district court entered a thirty-day stay so that the ESI Defendants could file an appeal. The ESI Defendants then timely appealed.

II.

We begin with the standards by which we review the district court's order. Generally, an order remanding a case to state court is not appealable. *See* 28 U.S.C. § 1447(d). Congress, however, created an exception to this rule for cases involving the federal officer removal statute. *See id.* When such a case is appealed, we review the issue

---

[6] The district court relied heavily on cases from the Sixth Circuit—in which the Opiate MDL Court resides—in analyzing whether removal was proper. Notably absent from the district court's analysis, however, was any discussion of this Court's precedent on the issue.

9

of subject-matter jurisdiction de novo. *Mayor & City Council of Baltimore v. BP P.L.C.*, 952 F.3d 452, 461 (4th Cir. 2020), *cert. granted*, 141 S. Ct. 222 (2020) [hereinafter *Baltimore*] (quoting *Ripley,* 841 F.3d at 209).[7] Further, the Supreme Court has provided clear instructions about removals under the federal officer removal statute. "Although Defendants bear the burden of establishing jurisdiction as the party seeking removal, the federal officer removal statute must be 'liberally construed.'" *Id.* (quoting *Watson*, 551 U.S. at 150 ) (internal citation omitted); *see also Willingham*, 395 U.S. at 407 (noting that the liberal policy in favor of federal officer removal "should not be frustrated by a narrow, grudging interpretation of § 1442(a)(1)"). "As such, the ordinary 'presumption against removal' does not apply." *Id.* (quoting *Betzner v. Boeing Co.*, 910 F.3d 1010, 1014 (7th Cir. 2018)).

### III.

With those standards in mind, we turn to the ESI Defendants' two arguments raised on appeal. First, they argue that the district court erred in finding that they were not "acting under" DOD's direction in administering and operating the TMOP. Second, the ESI Defendants contend that we should address the remaining two requirements for federal

---

[7] The Supreme Court of the United States issued a writ of certiorari in *Baltimore* to resolve the following question: "Whether 28 U.S.C. 1447(d) permits a court of appeals to review any issue encompassed in a district court's order remanding a removed case to state court where the removing defendant premised removal in part on the federal-officer removal statute, 28 U.S.C. 1442, or the civil-rights removal statute, 28 U.S.C. 1443." Petition for Writ of Certiorari, *BP P.L.C. v. Mayor & City Council of Baltimore*, No. 19-1189 (March 31, 2020). The case was argued on January 19, 2021.

officer removal and conclude that they have met their burden of establishing subject-matter jurisdiction.

## A.

As noted above, the district court concluded that the ESI Defendants' interaction with DOD "is too attenuated, infrequent, and peripheral to satisfy the 'acting under' requirement" and did not address the remaining two requirements for federal officer removal jurisdiction. J.A. 823–24. Accordingly, we must first determine whether the district court erred in finding the ESI Defendants were not "acting under" a federal officer.

"The statutory phrase 'acting under' describes 'the triggering relationship between a private entity and a federal officer.'" *Baltimore*, 952 F.3d at 462 (quoting *Watson,* 551 U.S. at 149). Although that phrase is broad, "the Supreme Court has emphasized that [it is] not 'limitless.'" *Id.* (quoting *Watson*, 551 U.S. at 147). "In cases involving a private entity, the 'acting under' relationship requires that there at least be some exertion of 'subjection, guidance, or control' on the part of the federal government." *Id.* (quoting *Watson*, 551 U.S. at 151). Moreover, the private entity must be engaging in "an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior." *Watson*, 551 U.S. at 152. Indeed, a private contractor may "act under" a federal officer when the relationship "is an unusually close one involving detailed regulation, monitoring, or supervision." *Id.* at 153.

In interpreting that general guidance, we have some guideposts. The Supreme Court has emphasized that "simply *complying* with the law" is not sufficient. *Id.* at 152. Thus, businesses that operate in fields subject to stringent federal regulations cannot use their compliance with federal law—without more—to invoke the federal officer removal statute.

11

*See id.* at 153 ("A private firm's compliance (or noncompliance) with federal laws, rules, and regulations does not by itself fall within the scope of the statutory phrase 'acting under' a federal 'official.'"). Likewise, a private company selling "standardized consumer product[s]" to the federal government does not implicate the federal officer removal statute. *See Baltimore*, 952 F.3d at 464. Even when a contract specifies the details of the sales and authorizes the government to supervise the sale and delivery, the simple sale of contracted goods and services is insufficient to satisfy the federal officer removal statute. *See id.* On the other hand, courts, like this one, "have unhesitatingly treated the 'acting under' requirement as satisfied where a contractor seeks to remove a case involving injuries arising from equipment that it *manufactured for the government*." *Sawyer*, 860 F.3d at 255.

With those guideposts in mind, we turn to the relationship of the ESI Defendants to the federal government. The ESI Defendants offered a Declaration from William T. Cahill, Express Scripts, Inc.'s Vice President of Government Markets – Federal and DOD, in support of removal. Cahill explained that "Express Scripts, Inc. contracts with [DOD] through the Express Scripts Military Health Statement of Work ('SOW')" and that "DOD is currently Express Scripts' second-largest client." J.A. 552.[8]

Cahill further explained that, "Express Scripts, Inc. provides pharmacy benefit management services, and [the ESI Defendants] administer[] the [TMOP] under the

_____

[8] As of September 30, 2018, DOD accounted for approximately twelve percent of the revenue of Express Scripts, Inc., Express Scripts Holding Company and the ESI Defendants. The following year, after the companies merged with Cigna Corporation, DOD accounted for eight percent of the combined companies' health services revenue.

12

detailed requirements of the [DOD] contract." J.A. 553–54. In order to satisfy the contractual requirements, the ESI Defendants "operate the TMOP under a shared service agreement" and process and dispense prescriptions to TRICARE members. J.A. 554. In doing so, the DOD contract "requires the exclusive use of the DOD formulary created by the DOD's own Pharmacy & Therapeutics [] Committee." J.A. 554. Thus, prescriptions are dispensed in accordance with the guidelines promulgated by DOD. Moreover, the SOW dictates how the ESI Defendants must operate the TMOP. Pricing, eligibility verification, shipping, payment and many other specifications are detailed in the SOW. Importantly, the ESI Defendants are required to comply with all of these contractual requirements along with the statutes, regulations and policy manuals governing the TRICARE program.

To ensure that Express Scripts, Inc. is complying with the terms of the contract, DOD has designated a contracting officer who is charged with managing the SOW. Representatives of Express Scripts, Inc. are in regular contact with the contracting officer, including weekly briefings and formal program reviews three times per year. Express Scripts, Inc., in turn, regularly interacts with the ESI Defendants. Express Scripts, Inc. "communicates guidance and instruction from the [contracting officer] or other Government representatives" to the ESI Defendants in order to "execute the SOW." J.A. 556. Although the ESI Defendants do not regularly coordinate with the contracting officer or DOD, there is some direct interaction. "For example, DOD representatives interact directly with ESI Mail Pharmacy employees during some audits that are performed under the contract." J.A. 557. Thus, while the ESI Defendants were not signatories to the DOD

contract, they performed the day-to-day management of the TMOP under the terms of the contract and were subject to extensive oversight by the federal government.

The district court, while acknowledging the ESI Defendants' role in administering the TMOP, seemingly misunderstood this relationship and further misapprehended the language and meaning of the DOD contract. Illustrating this, the district court stated: "[The DOD] contract and Statement of Work [] make no mention of, and impose no obligations on, anyone other than prime contractor, Express Scripts, Inc. And from the face of the contract and SOW, [the ESI Defendants'] involvement was not required, suggested, or anticipated." J.A. 822 (footnote omitted). Furthermore, the district court stated, in a footnote, that "[t]he SOW does not expressly anticipate that Express Scripts, Inc. would select a subcontractor . . . to administer the [TMOP] . . . ." J.A. 822 n.6.

The DOD contract provides otherwise. The SOW expressly contemplates the involvement of subcontractors. *See* J.A. 675 ("The Contractor shall ensure that its staff and subcontractors (if any) are thoroughly trained and knowledgeable regarding the requirements of this contract."); 676 ("The Contractor shall report all Contractor labor hours (including subcontractor labor hours) required for performance of services provided under this contract via a secure data collection site."). Not only does the SOW contemplate the use of subcontractors, it requires that they be "thoroughly trained and knowledgeable regarding the requirements of this contract." J.A. 675. And, of course, the DOD contract specifies, in detail, the requirements and oversight of the federal government.

Beyond these contractual provisions, Express Scripts, Inc. "is not itself a mail order pharmacy, but instead, is a pharmacy benefits manager [] that administers prescription drug

14

benefits for health plan sponsors." Appellants' Br. at 25. Therefore, the government had to anticipate that Express Scripts, Inc. would use subcontractors to operate and administer the TMOP.

The DOD contract not only contemplated the use of subcontractors; it also made them directly accountable to the federal government. The contract specifies that "[a]ny discrepancies identified by the Government . . . shall be subject to Contractor desktop audits and, if necessary, on-site audits at the direction of the Government." J.A. 664. It also states that "[i]nspections will be performed at the TRICARE Management Activity (TMA), the Contractor's and/or subcontractor's facctivit*s, or any other locations at which work is performed." J.A. 680.

What's more, Cahill's affidavit indicates the government actually exercised its audit and inspection rights with respect to the ESI Defendants. The affidavit states that the government performed some audits and had direct contact with the ESI Defendants' employees.

Last, as referenced above, DOD is required by law to enter into contracts for the provision of healthcare services to TRICARE members. *See* 10 U.S.C. § 1073a. And by operating various TRICARE programs, such as the TMOP, these contractors and subcontractors are providing healthcare services that DOD must, by law, provide. *See id.* § 1073a. In this way, the ESI Defendants are assisting DOD in fulfilling "basic governmental tasks" that "the Government itself would have had to perform" if it had not contracted with a private firm. *See Watson*, 551 U.S. at 153–54.

Taken as a whole, the ESI Defendants, by operating the TMOP, were carrying out the duties of DOD by operating the TMOP and were, at all times, subject to the federal government's guidance and control. This is the type of "unusually close [relationship] involving detailed regulation, monitoring, or supervision" sufficient to satisfy the "acting under" requirement. *See Watson*, 551 U.S. at 153. Further, the ESI Defendants' performance of the requirements outlined in the DOD contract is substantially different than the simple sale of commercial goods to the government. Nothing about the ESI Defendants' obligations could fairly be characterized as "standardized consumer product[s]." *Baltimore*, 952 F.3d at 464. In fact, the ESI Defendants were essentially acting as the statutorily authorized *alter ego* of the federal government, as the TRICARE statute requires the Secretary of Defense to contract out the administration of the TMOP program. *See* 10 U.S.C. § 1073a. The ESI Defendants largely performed the day-to-day administration of the TMOP pursuant to a lengthy and detailed SOW. In light of the liberal policy in favor of federal officer removal, the ESI Defendants have met their burden of showing they were "acting under" a federal officer.

Consistent with that, the absence of privity of contract between the ESI Defendants and the government does not lead to a different result. As the district court properly concluded, "the absence of a *direct contractual relationship* with the federal government is *not* a bar to removing an action under § 1442(a)(1)." J.A. 818. Indeed, if this were not the case, the availability of the federal officer removal statute would be significantly curtailed as federal contracts are often carried out, at least in part, through subcontractors. Thus, courts must look beyond whether the ESI Defendants are parties to a contract with

16

DOD to the nature of the relationship between them. When we do that, as described above, the ESI Defendants meet the statute's "acting under" requirement.

B.

Having determined that the ESI Defendants meet the first requirement of the federal officer removal statute, we turn to whether the case should be remanded to the district court for a ruling on the remaining two requirements for federal officer removal. Generally, federal appellate courts should not consider issues that were not first addressed by the district court. *Bakker v. Grutman*, 942 F.2d 236, 242 (4th Cir. 1991) (citing *Singleton v. Wulff*, 428 U.S. 106, 120 (1976)). However, "[t]he matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases." *Id.* (quoting *Singleton*, 428 U.S. at 121). Under the unique circumstances of this case, we find that judicial economy favors our resolution of the remaining issues. The issues have been fully briefed and resolving them without a remand will allow Arlington to litigate the merits of its case as swiftly as possible without the possibility of another appeal based solely on jurisdictional grounds. Therefore, we will consider the second requirement of the federal officer removal statute—whether the ESI Defendants have a colorable federal defense—before evaluating the third requirement—whether the conduct about which the plaintiffs complain is sufficiently connected with the government-directed conduct.

1.

17

"Courts have imposed few limitations on what qualifies as a colorable federal defense. At its core, the defense prong requires that the defendant raise a claim that is 'defensive' and 'based in federal law.'" *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 138 (2d Cir. 2008) (quoting *Mesa v. California*, 489 U.S. 121, 132–34 (1989)). The Supreme Court has emphasized that such a defense must "aris[e] out of [a defendant's] official duties." *Arizona v. Manypenny*, 451 U.S. 232, 241 (1981). "To be 'colorable,' the defense need not be 'clearly sustainable,' as the purpose of the statute is to secure that the validity of the defense will be tried in federal court." *Isaacson*, 517 F.3d at 139 (quoting *Willingham*, 395 U.S. at 407). Instead, the defense must only be plausible. *See City of Cookeville, Tenn. v. Upper Cumberland Elec. Membership Corp.*, 484 F.3d 380, 391 (6th Cir. 2007). Here, the ESI Defendants have invoked two federal defenses—government contractor immunity and preemption. We address these in turn.

First, the ESI Defendants claim they are entitled to assert government contractor immunity "for services provided to the DOD regardless of whether they are deemed corporate affiliates or subcontractors." Appellants' Br. at 41. This defense applies when: (1) the government "approved reasonably precise specifications"; (2) the contractor's performance "conformed to those specifications"; and (3) the contractor alerted the government to dangers "known to [the contractor] but not to the United States." *Ripley*, 841 F.3d at 210 (internal quotation marks omitted).[9] "The defense only applies if a

---

[9] Although *Ripley* was a failure to warn case, courts have not restricted the defense to those claims, instead finding it is available for contractors providing services to the government. *See, e.g.*, *Bennett v. MIS Corp.*, 607 F.3d 1076, 1089–91 (6th Cir. 2010)

18

contractor's obligations to the government conflict with state law such that the contractor may not comply with both." *Id.*

Instructively, the government contractor immunity defense has already been raised in a pair of cases filed by two Native American tribes against opioid manufacturers, distributors and pharmacies. *See In re Nat'l Prescription Opiate Litig.*, 327 F. Supp. 3d 1064, 1078 (N.D. Ohio 2018). McKesson Corporation removed both cases to federal court and invoked the federal officer removal statute because it distributed drugs on behalf of the government to the Native American tribes.[10] *Id.* at 1070–71. The Opiate MDL court held that it was plausible that McKesson's contract with the government to provide opioid medications contained "reasonably precise specifications and that McKesson's deliveries conformed to those specifications." *Id.* at 1078. Furthermore, the Opiate MDL court held, regarding the third prong of the above test, that "McKesson can plausibly argue that it was aware of no greater danger than the government was already aware of." *Id.* Therefore, the Opiate MDL court concluded that McKesson's invocation of the government contractor

---

(holding that the government contractor immunity defense was available to mold remediation contractors who were being sued by air traffic controllers who alleged personal injury "based on their exposure to toxic mold at the Detroit Metropolitan Wayne County Airport").

[10] It appears McKesson was distributing pharmaceutical drugs to the Cherokee Nation and the Lac Courte Oreilles Band of Lake Superior Chippewa Indians—the plaintiffs in the lawsuits—on behalf of the Department of Veterans Affairs and the Indian Health Service pursuant to a pharmaceutical prime vendor contract. *See In re Nat'l Prescription Opiate Litig.*, 327 F. Supp. 3d at 1071.

19

immunity defense was plausible. *Id.* In reaching this conclusion, the court emphasized that "the 'colorable federal defenses' prong is a low bar." *Id.*

We find the Opiate MDL court's analysis persuasive. Similar to McKesson, the ESI Defendants have plausibly alleged that they distributed opioid medications pursuant to reasonably precise specifications found in the DOD contract and, more specifically, the SOW. Furthermore, the ESI Defendants' allegation that they were not aware of any greater dangers than DOD or the federal government more generally is plausible. That does not mean the ESI Defendants will prevail on this theory. We offer no opinion on that question. But it does mean that they have met the jurisdictional requirement of possessing a "colorable federal defense."

Additionally, the ESI Defendants have invoked a federal preemption defense. The TRICARE statutory scheme contains a preemption provision, which states:

> A law or regulation of a State or local government relating to health insurance, prepaid health plans, or other health care delivery or financing methods shall not apply to any contract entered into pursuant to this chapter by the Secretary of Defense or the administering Secretaries to the extent that [they] determine that –
>
> > (1) the State or local law or regulation is inconsistent with a specific provision of the contract or a regulation promulgated by the Secretary of Defense or the administering Secretaries pursuant to this chapter; or
> >
> > (2) the preemption of the State or local law or regulation is necessary to implement or administer the provisions of the contract or to achieve any other important Federal interest.

10 U.S.C. § 1103(a).

The ESI Defendants argue that Arlington's theory of "liability is predicated on [their] alleged failure to implement a specific formulary, specific opioid utilization limits, or restrictions different from those the DOD mandated for the TRICARE program." Reply Br. at 6. In other words, they insist that the conduct about which Arlington complains is conduct that they were required to carry out to comply with the language of the DOD contract as well as the TRICARE statute, regulations and policies. For that reason, the ESI Defendants argue Arlington's state law claims are inconsistent with that contract, statute and regulatory scheme. Again, we express no view as to whether the ESI Defendants will ultimately prevail on this defense. But under the well-established preemption doctrines applicable to such claims, it is plausible that the ESI Defendants have a valid preemption defense.

Accordingly, we conclude that the ESI Defendants have raised colorable federal defenses.

2.

Finally, we are left with the question of whether the ESI Defendants' government-directed conduct is related to Arlington's claims. "To satisfy the third prong [of the federal official removal statute], the conduct charged in the Complaint need only 'relate to' the asserted official authority." *Baltimore*, 952 F.3d at 466. "That is, there must be 'a connection or association between the act in question and the federal office.'" *Id.* (quoting *Sawyer*, 860 F.3d at 258). Generally, "[w]e credit Defendants' theory of the case when determining whether" there is such a connection or association. *Isaacson*, 517 F.3d at 137 (citing *Jefferson Cnty. v. Acker*, 527 U.S. 423, 432 (1999)). As we explained in *Sawyer*,

21

this "connection or association" standard is broader than the old "causal nexus" test that we abandoned after the Removal Clarification Act of 2011, Pub. L. No. 112-51, 125 Stat. 545, expanded § 1442(a)(1) by inserting "or relating to" into the third requirement for removal. *See* 860 F.3d at 258 (explaining the shift from "*for* a[n] act under color of office" to "for *or relating to* any act under color of [federal] office" (alterations in original)).

Arlington insists this requirement is not met. It argues that its Amended Complaint did not even mention the distribution of opioids to veterans, the DOD contract or the operation of the TPOM. Its allegations, according to Arlington, have nothing to do with DOD or its program.

But Arlington's position would elevate form over substance. Arlington's claims seek monetary damages due to harm arising from "every opioid prescription" filled by pharmacies such as the ESI Defendants. *See* J.A. 58. Specifically, as noted above, Arlington claims that the ESI Defendants distributed opioids into the Arlington County, Virginia community pursuant to their "formularies." *See* J.A. 96. But the ESI Defendants filled prescriptions and distributed opioids under the provisions required by DOD. More specifically, the ESI Defendants were legally bound to follow DOD's formulary when administering the TMOP and had no discretion to deviate from the DOD contract's requirements. *See* J.A. 628 ("Features of the pharmacy benefits program include the use of the DoD Uniform Formulary . . . ."); 650 (requiring compliance "with the provisions of the DoD Uniform Formulary and its copayment structure"). Thus, whether or not it mentions the TMOP, Arlington's claim that the ESI Defendants "did nothing to stem the flow of excess opioids into Arlington County" necessarily includes activity that is directly

22

connected to the DOD contract, as the ESI Defendants were required to act in conformity with that contract. J.A. 58. In other words, Arlington faults the ESI Defendants for filling certain opioid prescriptions and causing a public nuisance, but the ESI Defendants were required to fill those prescriptions to comply with their duties under the DOD contract because they had no ability to modify the contract.[11] That does not mean that the ESI Defendants will prevail in the case. But it does mean that Arlington's claims "relate to" the ESI Defendants' governmentally-directed conduct. That is sufficient to satisfy the federal officer removal statute.

## IV.

For the reasons stated above, we conclude that removal under the federal officer removal statute was appropriate. Accordingly, the district court's order is

*REVERSED AND REMANDED.*

---

[11] To be sure, the DOD contract required the ESI Defendants to "comply with Federal and State law and all applicable state board of pharmacy requirements," J.A. 639, but it did not vest the ESI Defendants with authority to modify the contractual terms based on a subjective belief that opioids were prescribed *en masse* too frequently. We emphasize again, however, that the findings in this Opinion relate solely to the ESI Defendants' jurisdictional burden and are not a comment on the merits of Arlington's claims or any potential defenses asserted by the ESI Defendants.